Now, you're doing good, just like you used to. All right, Mr. Yochum. May I please have the floor? My name is Brian Yochum of the Tennessee Bar. It's a pleasure to be here this morning. I represent Evergreen Apartments, L.L.C., and Fountain Blue Management Services, who are the owners and management company of the Agreed Department Complex located in Tupelo, Mississippi. The issue which I'm appearing here today for this honorable court is regarding the proper application of discretionary function immunity under Mississippi law in the Mississippi Toward Claims Act with respect to a negligence claim that the City of Tupelo was negligent in the design, planning, construction, operation, and maintenance of its public outfall sewer. Can I ask you one quick just context question? What is the status quo? I don't mean of the litigation, but the things in the apartment, all the rest of it, I mean, are things on hold pending this litigation or have other things occurred? Yes, Your Honor. I don't mean for you to comment outside the record impermissibly. Outside of the record, Your Honor, my clients still own the property and still manage the property. The property is for sale. The last time our expert— I mean, is it still occupied? That's what I meant. Yes. It's still an ongoing— That is correct, Your Honor. There are 257 units, and approximately 210 of those units are currently available for occupancy, and I think it's probably at about a 70 percent occupancy rate. Okay. The all-new candor, 48 of the units which incurred the most flooding in this situation and have had the most problem over time with the flooding of the sewage, those have been declared a nuisance by the Tupelo City Council, and we have appealed that decision to the Circuit Court of Lee County. Okay. I just wanted a little sort of background in terms I couldn't tell from the record. Anyway, go ahead. Thank you. And this issue that we're here before today, the proper application of discretionary function immunity, as the Court is well aware, has been a point of major debate and disagreement in the state of Mississippi with respect to the operation of public sewers since at least 2011 when the Mississippi Supreme Court had its 5-4 decision in a case Fortenberry v. City of Jackson. Following that, the Pratt v. Gulfport-Biloxi case added a little bit of further confusion. Discretion. You got that right. Excuse me? You got that right. There is confusion. Your Honor, I think I'm going to get to the point where I'd like to take the position that the confusion that has been created by the Mississippi Supreme Court has been resolved by the Mississippi Supreme Court at this point in its January 2016 decision in Crum v. City of Corinth. And it's our position, Your Honor, that that case will mandate a reversal and remand of the summary judgment entered against my clients in this case. With all due respect to the district court in this matter, Evergreen and Fountainbleu believe that the court made a reversible error for multiple reasons, all of which have been briefed. But if the court would please, I'd like to focus on two primary issues today. One would be the district court's failure to consider the totality of the appellant's factual claims that are set forth in the complaint and as are provided in an affidavit of William D. Butch Porter, who is an expert engineer in hydrology and sewer systems. We believe that the court apparently overlooked some of those claims and some of those facts. And I would also respectfully remind the court that those pleadings were all made in light of the Fortenberry case. So this lawsuit was filed in August of 2013, which was when we were still operating under Fortenberry v. City of Jackson. And since Fortenberry v. City of Jackson, our suit was filed August 23, 2013. Seven weeks after our suit was filed, the court proceeded to completely overhaul discretionary function immunity in Mississippi. On October 17, 2013, it rendered its opinion in Little v. Mississippi Department of Transportation and then continued on to apply further scrutiny in Brantley v. City of Horn Lake, which was in December of 2014. And then it was applied to sewer systems, the new analysis, the new paradigm, in 2015. So the facts that were pled in the appellant's original complaint were crafted to try to address the four-justice minority opinion in Fortenberry and the opinion of the court in 2012 in Pratt v. Gulfport-Biloxi Regional Airport. Since that time when the appellants filed their complaint, discovery was stayed in this case on March 6, 2014. No discovery beyond initial disclosures has ever been conducted in this case. And certainly the paradigm has completely changed since that time. So with respect- I'm confused. We sent this case back, didn't we? You did send this case back in light of the court's opinion in Borgerdi v. City of Starkville. It got sent back, and the district court allowed briefing only on the application of Borgerdi v. City of Starkville. We were not allowed to do any discovery or amend any pleadings. So is your claim- I didn't get this, I think. I'm sorry. Is your claim that when the case was sent back, you were refused an opportunity to amend your pleadings or do discovery? Well, Your Honor, when the case was sent back, when it was remanded, an order was issued from the district court stating that the parties were only to provide briefing on the application of Borgerdi to the facts of our case. We were not offered an opportunity. We were instructed that that's all we were allowed to do. Well, when you filed your brief in this- I should have looked at it. When you filed your brief that he allowed the district judge- I don't know if it's a he or a she. She. She. You should know that. All the better people. That when she allowed you to do that, did you say, well, in your brief, we need an opportunity to amend our pleadings, to take discovery, and so on? I mean, did you make the argument that you're making to us to her? Yes, Your Honor. We have included in our brief the point repeatedly that in Borgerdi v. City of Starkville, that case was-summary judgment was granted for the city, and it was remanded to the circuit court to allow for the pleadings to be amended and for discovery to proceed. And we've made that point in our brief to the district court and advised the district court that the Mississippi Supreme Court said that to not allow the property owner to amend and to pursue some discovery would be, quote, patently unfair. So we've made that argument to the district court, but we did not directly ask, we did not file a separate motion to be allowed leave to amend. We followed the court's order and briefed on these issues, and our brief did include- Well, the scope of the Fifth Circuit mandate was with respect to the change in the law. So when it went back down, I mean, our court's mandate was, you know, laws change, da-da-da-da. So, I mean, I can see, I'm not saying she was right, but I can see the district court looking at the narrow mandate that came from the Fifth Circuit, you know, sort of reconsidering in light of new laws. So then I could see district court saying, okay, brief the issue, blah-blah-blah, and not necessarily tuning into a whole new arena, new pleadings, new discovery, et cetera, et cetera, because the basis of the mandate from the Fifth Circuit was on that legal area. So to Judge King's question, I mean, you say you told her, but I'm not sure. It's evident to me how it's kind of one of these deals, you know, where you're really waving because she's looking at the mandate that came down to do what it said. So, I mean, how is it palpable to the district court that given the mandate and change in law, that amendment of the pleadings back from 2013, in other words, was inextricably tied to dealing with the Supreme Court opinion? Do you understand what I'm saying? Yes, Your Honor. And, Your Honor, our position would be that the district court followed the Fifth Circuit's mandate and we followed the district court's order. And if this court were to believe that a revision to our pleadings or some discovery would be proper on a second remand, we would certainly be pleased to proceed in that manner. However, I believe based on the Mississippi Supreme Court's decision in January of 2016 in Crum, that the pleadings as we originally made in this case, along with the affidavits that are on record, that would be ROA 67 to, sorry, 196 to 198, are sufficient to have this court reverse the summary judgment and remand. Based on the facts in Crum as compared to the facts alleged in our case. Our case, we have asserted facts that are significantly beyond the facts alleged in Crum. In Crum, Ms. Crum just alleged that a manhole cover was missing and a root was growing into her pipe and that caused the backup in the sewer. In our case, we have alleged that our property is actually bisected directly down the middle by a tributary of a creek named King's Creek, thereby making the property a jurisdictional waterway pursuant to the Clean Water Act. And that is well beyond what Ms. Crum has pled. But in Crum, the court held, quote, if you take her allegations true that the backflow of sewage into her home was due to the fault of the city and not properly maintaining the sewer and or its manholes and or the City of Corinth causing the sewer system and her manholes to flood by action of the City of Corinth or its employees, it cannot be said to a certainty that Crum would not prevail under any set of facts that could be proved to support her claim. So we have asserted similar claims with respect to missing manhole covers and cracks. We've also asserted there are cracks in the city's sewer pipes, which allow water to infiltrate into the city sewer through the missing manhole covers, through the cracks in the pipe, which then causes the water to surcharge and backflow into our private sewer line, which has caused the flooding. We have also alleged in the complaint that the flooding of sewage occurred not only in the units, but onto the ground and onto the property. And that's important if this court believes that the Clean Water Act has to be implicated here in order to make this a ministerial function. Because in our case, we have alleged, as I said, that this property is bisected by a tributary. What's the narrowest form of relief you want from this panel? You want us to vacate the summary judgment order so that you can get another round with an amended pleading and all of that? Or are you saying the other side was not entitled to summary judgment as a matter of law because the district court did not apply the Mississippi Supreme Court? Your Honor, at first I would ask that the court consider reversing and remanding and allowing this case to proceed based on the current pleadings, but because the court misconstrued majority and crumb. So in that context, you're saying they can't remand because it was an error of law. In other words, summary judgment was inappropriate as a matter of law. That would be my first point. And then the backup position, Your Honor, would be that it would be, as the Mississippi Supreme Court has described in light of all of the confusion that's been in this area of law, it would be patently unfair to prevent my clients an opportunity to amend their pleadings and conduct some reasonable, reasonably tailored initial discovery into this. That's an equity argument. Your secondary is an equity argument? Well, it would be supported by the opinions of the Mississippi Supreme Court in majority and in McGee v. Jones, which actually was in favor of the municipality. All right. I just wanted to get you clear in my head sort of what was being sought and on which basis given that it's appeal from a summary judgment. There are two levels of relief that we request, Your Honor. All right. Well, you reserve your rebuttal time. Thank you. Thank you, sir. All right. Mr. O'Donnell. May it please the Court, David O'Donnell on behalf of the City of Tupelo and the publicly owned treatment works that are the defendants and employees in this case. Let me start with the points that were just raised relating to the issue about discovery, which is really more of a procedural issue than the status of this case. There was never a request before the district court by the appellant to amend pleadings, to engage in discovery as it related to the pending motion for summary judgment. In fact, there was a state of discovery that was entered by the magistrate judge after the plaintiff filed their response to the motion for summary judgment. And in reference to the Crum case, the Crum case, once it remanded the case back, to allow the party to amend pleadings addressing the change in the law, that's a 12B6 case. And the court in that case was expressing discomfort with the status of the pleadings in light of the change in the law, and therefore deemed it appropriate in light of the general allegations to allow the plaintiff an opportunity to amend. But it wasn't going to affirm the judgment because, as a matter of liberal pleading, under Mississippi's 12B6 standards, there was enough to get the plaintiff by the 12B6 motion, with a further added notion that, given the change in the law, the plaintiff would be allowed an opportunity to amend pleadings, to square it up with the Bozierity case, if I'm pronouncing that right, and the Brantley case. So Crum doesn't help this case. It's a 12B6 case, and here we have a motion for summary judgment, which pierces the pleadings. And there is no proof in this case, as a matter of summary judgment, that would avoid the bar of the statute of limitations. Under the Mississippi Tort Claims Act, there is a one-year statute of limitations for all claims. And as the summary judgment record will reflect, the plaintiff was first put on notice of the sewage backup issues that are raised in this case. Back in 2008, with the filing of the Adkins complaint in the Federal District Court in Mississippi, that case was eventually dismissed as a matter of jurisdiction, refiled in state court, again alleging the same issues that are raised in this case, and that is that there were sewage backup issues experienced by the apartment dwellers in the apartments owned by the plaintiff. The issue of who was responsible for the sewage backup was litigated in that case in 2008, 2009, 2010. And there is, as far as the statute of limitations is concerned, the plaintiff was put on notice without question as to the issues of causation of that sewage backup. They have an affidavit in this case by Mr. Porter, who was hired by the plaintiff years later in 2012, and early 2013, and he was hired for the purpose of determining the issues relating to the sewage backup and the sewage lines. Why he wasn't hired earlier, we're not informed of that. But I think it speaks to the lack of diligence in discovering their cause of action against Tupelo. But I think as a matter of law, the district court was correct to the extent that it did apply the statute of limitations that the causes of action accrued in 2008 when the Adkins case was first filed and certainly accrued when the Calvert case was filed, and that was in 2010. What is the snapshot of the summary judgment record? We have, like, depositions or affidavits from all these various persons, the city people. I'm not asking you to tell me what everybody said, but what's in there? It's basically depositions from the city people, et cetera, the statutes, that kind of thing. Is that what the summary judgment record is? Yes, sir. There were a couple of affidavits supplied by the plaintiff, Porter, their engineer, one of the principal owners of the apartment complex, supplied an affidavit relating to a conversation he had with Tupelo officials back in 2008. The other substantive evidence dealt with a couple of depositions that were produced in the Adkins case where counsel for Evergreen was asking Tupelo officials, Ms. Ford, I forget the other lady's name, asking them about efforts by the city of Tupelo to discover the reasons for the sewage backup. So all that was in the summary judgment record before this court. And then, of course, copies of the permit that allow the city of Tupelo to discharge affluence, treated water into the state and navigable waterways. So that's the gist, Your Honor, of the summary judgment record. Never a request, once the magistrate entered the order to stay discovery after the plaintiff filed their response to this motion for summary judgment, there was never a follow-up request to the district court in appeal or follow-up request to the district court at any time, including after remand, to conduct discovery as to any issue they felt that was germane to the determination of the statute of limitations defense or whether discretionary function exemption applied in this case. Never a request. And I would add this, too, in terms of the amendment to the pleadings. There was an amendment to the complaint filed on August 2014 by the plaintiff. So there's a second amended complaint in the record. So there are opportunities to amend, and they took that opportunity in this case, but never a request after remand to amend pleadings, nor did I think it was necessary. I think if you looked at the second amended complaint, you'd see that the complaint allegations did address the construct that Brugeretti and the Brantley case suggested in terms of determining whether the discretionary function exemption applies. That is, is there a discretionary function at stake, and if so, is there a more narrow ministerial function at stake in terms of the claims that are raised against the defendant, the city of Tupelo. So you'll see that in the second amended complaint. So I don't think there was a need, nor did they take the opportunity, to seek another amendment to the complaint in reference to the court's determination of the summary judgment motion. This issue about the ditch being a jurisdictional waterway, I guess I should put it in the context of the particular issue. The issue of, let me first address the statute of limitations, because I think that is determinative of all issues in this case. Statute of limitations, I think, applies clearly to issues of design and construction. As the district court held, I don't think there's really any genuine argument in opposition to that. As far as maintenance is concerned, the maintenance that was offered, the maintenance issue offered in relation to the statute of limitations defense related to the placement of the outfall sewer line, which the plaintiff said was too shallow. And you'll see the district court focused on that as far as whether there is a maintenance issue here that would bring the claim within the continuing tort exception to the bar of the one-year statute. The theory being that, you know, fair to maintain over a period of time was in and of itself a separate cause of action, so there's a continuing tort. There's no record in this case on that. No proof that there was any alleged act of non-maintenance or fair to maintain at any time within the one-year statute prior to the time this complaint was filed in August of 2013. There's a reference to the Birch-Porter affidavit, but if you look at the affidavit, it really relates to only issues of design and construction and does not address issues of maintenance. And that's what the district court relied on in deciding that the one-year statute did not bar the maintenance-oriented negligence claims against the city of Tupelo. Beyond that, the discretionary function exemption clearly applies because, under the Bejerde case, the Brantley case, operations of sewage treatment facilities is presumptively discretionary under Mississippi law. That is, cities can engage in the provision of sewage treatment and operate sewage treatment facilities in their discretion. They can operate, design, and maintain in their discretion according to the statute. The question in this case is, is there a more narrow ministerial duty at stake? And in this case, the plaintiff focused on the terms of the discharge permit that was issued to argue that the permit contained provisions that created ministerial duties that were violated or breached by the city's failure to maintain the manhole or allow the cracks in the sewage pipe. The terms of the permit do not address those issues. In terms of the permit, if you look at the scope of the permit, the purpose of the permit is to allow the city of Tupelo to actually discharge affluence into the state navigable waterways. That's the purpose of it. So when we look at duties, the duties are associated with the right and the ability under the permit to discharge. So any facilities that relate to the discharge of affluence within the limitations imposed by the permit, that's where the duty lies. The duty does not lie under the terms of the permit in terms of preventing back spills into apartments. That's not a discharge, which is a term of art under the Clean Water Act. That's not a discharge within the meaning of the Clean Water Act. A discharge in the Clean Water Act is a discharge in the navigable waterways. So, for example, if there's a sewage back up into an apartment, it floods a bathtub, that's not something within the purview of the Clean Water Act. So I think it's important to look at the scope and purpose of the permit at issue in this case in determining whether or not there is a ministerial duty at stake. And I think the district court correctly decided that issue in determining that there was no ministerial duty that was breached or implicated by the city's alleged failure to keep the manhole cover on the adjacent sewer, which is what's being alleged here. This jurisdictional waterway, that's an issue that has come up for the first time in this case in a reply brief that was filed with this court. It's never been raised before that this ditch that bisects this property is somehow connected to navigable waterways. There's a description of the ditch and its connection to a creek called King's Creek, but only as a matter of describing the property. But there's no allegation and no proof that this ditch should be considered a tributary of King's Creek and whether King's Creek is connected to anything that would relate to state or navigable waterways. But again, that's... But even if it does, then what? Let's assume that it does. Then what's the next argument of the plaintiff? Well, I think their roundabout way and the reason why they're referring to it now is they're trying to bring the city's fair to maintain within the purview of the permit as a permit which limits effluent discharges into navigable waterways. I don't think they'd get there even when bringing that into the reply brief because there's no allegation that any of the discharges were discharged into the ditch or into King's Creek or that the sewage backup's an issue. I got the impression that the problem was that they didn't go into the ditch. Good point, Your Honor. So they can't get to navigable waterways or waters of the state even by reference to the ditch or King's Creek because there's no proof in the summary judgment record that there was any discharge or threat to discharge into these areas. I had the idea that the alleged problem here is that the pipes that carry the sewage are too high and one of the reasons they're high is because of this ditch and that something has to go over the ditch and therefore this stuff backs up into the apartments. I mean, I guess you can't deny the fact that the sewage backs up into the apartments and that's a problem where I think, so the problem apparently is to try to tie that to a ministerial function. And what they point to to establish ministerial function with regard to the shallowness of the line that goes into or out of the Tupelo's main sewer line is a document that's referenced as the guidance. Guidance? The guidance. There's a guidance that's published by the, I think, the Mississippi Department of Environmental Quality. But the terms of the guidance are explicitly discretionary and voluntary. It says so right on the first page of the guidance. They are not a regulation. They have not been approved by the Department of Environmental Quality in Mississippi. They're advisory only. So they don't, therefore, inform a ministerial duty in this case. They can be followed or they cannot be followed at the City of Tupelo's discretion. Let me ask you, I asked Council Officer when he got the tracts, just kind of a snapshot, status quo, et cetera, as Judge King says. I mean, the one thing that's not in dispute is that there's a problem. Litigation over whose problem it is, da-da-da-da-da-da, but a problem and a health one and all that. I'm assuming but don't know that there is an engineering construction. There is a solution, so to speak. Is that true? If you know, I don't know. I believe there is a solution. It lies within the plaintiff's appellate's property. It lies within, and this is really not a matter of germane disarming judgment, but just as a matter of Tupelo's position, it's a problem of the appellant's sewage lines. They weren't maintained properly. They're too narrow. There's issues of abuse within the apartments themselves in terms of what they're using the sewage system for. There's all sorts of things. So Tupelo's position is this case is not viable because of the one-year statute, whether we're talking about construction, design, maintenance, operation. They were well aware of the circumstances of these claims as early as 2008, did not reasonably pursue their claims against Tupelo until 2013. To the extent it's not barred by the one-year statute, then the claim is barred by the discretionary function exemption because the city of Tupelo's duties, well, they're all subject to discretionary function and there's no associated ministerial duty that anyone can point you to say, this provision required that you do X and you did not do that. There's nothing in this case that suggests that. So that's our position. Thank you. All right. I'm going to ask counsel when he comes back up, in the last part of his summary of the argument, he says, the Mississippi Supreme Court has recently confirmed that factual allegations practically identical to Evergreen owners and the rules and regulations relied upon by Evergreen owners are sufficient to defeat a motion for summary judgment. I'm going to ask him, but do you know what case he is adverting to? Is that Crum, which you've said is a 12B6, or do you know? I have to assume he's referring to Crum because that's what he referred to in his initial remarks before the court, but it's not suggested. Again, Crum is a 12B6 case. The court's expressing discomfort with the status of the pleadings. Okay. The Bagiardi case, again, that's another case where the court remanded back to give the plaintiff an opportunity to make their arguments in light of the Brantley case. Was that 12B6 or that summary judgment? That was a summary. I'm not certain on that point. Well, as I said, I'm going to ask him, but while you were up, if you knew, I wanted to have you address that, but I got you on the Crum and 12B6. Yes, sir. Okay. Thank you. All right. Thank you, sir.  Back to you, Mr. Yochum. Why don't you start with my question. You say the Mississippi Supreme Court has recently confirmed the facts of the allegations are practically identical, da-da-da-da-da, or sufficient to defeat motion for summary judgment. What is the antecedent of that? Are you still talking about Crum? I am, Your Honor, still speaking of Crum. Then what do you do with his rebuttal that Crum is a 12B6, where obviously in a 12B6 you're looking at the plausibility of the pleadings, et cetera, et cetera, not facts. There is a difference. In summary judgment, quite obviously, you're not looking strictly at the pleadings. When I read this, I was of the view that it was a summary judgment case. I mean, I get your argument, but I'm trying to get to the point he makes here that Crum doesn't help you because it's 12B6. It is looking at pleadings, and he's tying that to say you didn't ask to amend pleadings back when, da-da-da-da-da, so really you can't get the thrust of Crum, A, because it's not 12B6, B, because you don't have a pleading case here to get there. So I just was trying to make sure I understood the core of the argument. Thank you, Your Honor. Yes, Crum was a, you're correct, it was a 12B6, and majority was a summary judgment case. What are you going to do? Well, anyway, go ahead. In Crum, I think it's important that the court address, and I've only got a short time left, and it's not been raised here, that the court applied Mississippi Administrative Code, section 11-6, colon 1-1-4A18. And that is the basis, and it's my understanding from reading Crum, that the court was making some factual analysis and continuing through its . . . But you agree the analytical focus in the 12B6 is just different. It's on pleadings. It is different. Right? Yes, Your Honor. All right. Now, shifting, their main gear here is the statute of limitations, which is what the district court held. So we've heard your arguments in terms of the other. So what do you do about that? I mean, the argument in the briefs and otherwise is your clients knew, should have known, did know, actually knew, et cetera, enough to file it within the one year. There's no dispute that the one year is applicable. Your Honor, what the district court held was that the claims for design, planning, and construction, equitable estoppel did not apply and the continuing tort doctrine did not apply. But the district court did determine, based on the record, that our claims for operation and maintenance were continuing torts because the clear allegations in the complaint are that there are missing manhole covers currently at the time the complaint was filed. There are cracks in the pipe. So those were continuing torts, torts which are occasioned by the continual unlawful acts that the negligence was continuing, Your Honor. So we believe that the court was correct in finding that maintenance and operation was a continuing tort. The pleadings, the depositions that Tupelo's counsel were referring to creates all sorts of disputed facts as to what was going on in 2008 and 2009 between the city of Tupelo officials, Linda Ford, Deborah Bird, and Tupelo and raises the issue that the court needs to be aware of. It's in the record that Tupelo was telling Evergreen Square that the problem with the sewage backups was that the pipes on Evergreen Square's property were too narrow and mandating that Evergreen Square hire a particular plumber to make those repairs. And it turns out later we find that that plumber that the city of Tupelo required to do those repairs to install larger sewer pipes was moonlighting as a plumber from his day job as an officer in the Tupelo code enforcement department. And that's where a business dispute arose and this matter really got off and running when a dispute arose between the moonlighting plumber and my clients and then the city of Tupelo came to shut down the property, shut down a portion of the property. When were these apartments built? To the best of my recollection, Your Honor, in the 60s, I believe. Oh. The 70s. I don't have an exact date. But we believe the court was correct at least in holding that the maintenance and operation is continuing to work based on our allegations in the complaint. All right. All right. Thank you, Mr. Yochum. Thank you, Your Honor. We have your argument. It's still down. Thank you.